IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 08-cr-00452-JLK

UNITED STATES

v.

JOHN BROWNFIELD, JR.,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER ON SENTENCING

---

Kane, J.

## I.

## INTRODUCTION

      I have written this sentencing memorandum, which is more extensive than most such findings and conclusions, because this case involves issues the Sentencing Guidelines do not address regarding the criminal justice system's treatment of returning veterans who have served in Afghanistan and Iraq.  As I conclude that the Sentencing Guidelines' advice is not persuasive in the circumstances of this case, I will make specific findings necessary to achieve the purposes of 18 U.S.C. § 3553 (2006). This memorandum opinion will be published and copies provided to the United States Sentencing Commission pursuant to the implicit suggestion in *Rita v. United States*, 551 U.S. 338, 357-58 (2007).

On October 28, 2007, a single count information was filed charging John Kenneth Brownfield, Jr., (Brownfield) with Bribery of a Public Official, in violation of 18 U.S.C. § 201(b)(2)(A) and (C).  On November 17, 2008, Brownfield appeared with counsel and pleaded guilty to the information in accordance with a Plea Agreement containing sentencing provisions that were not binding on the court.  Both parties contemplated use of the Sentencing Guidelines.  In exchange for Brownfield's guilty plea,  the government agreed to recommend that he receive a three-point reduction in the offense level for acceptance of responsibility and timely notification of his intention to plead guilty.  The government also agreed that if Brownfield did not request or receive a downward departure or variance, it would recommend that he be sentenced at the bottom of the applicable guideline range.  The resulting recommended sentence was at the bottom of the guideline range.[1]

The guilty plea was accepted after Brownfield was advised that I was not bound by his agreement with the government, that I did not then, and would not until I had received and studied the Presentence Investigation Report prepared by the court's Probation Department, know whether I would follow the Sentencing Guidelines in pronouncing his sentence.

Both parties kept their bargain and appeared for sentencing on February 20, 2009, with a joint recommendation that Brownfield be sentenced to confinement for one year and a day plus two years of supervised release.  I asked counsel why they recommended

---

[1] The recommended sentence was for twelve months plus one day.  The additional day was intended to qualify Brownfield for release after having served 85% or approximately ten and a half  months of his sentence.  If the sentence were for twelve months only, Brownfield would have to serve the entire twelve months.

a year and a day as opposed to twelve months, eighteen months, three years, or five years. The answer was, "Because it's at the bottom of the Guideline range." Counsel could provide no explanation of why the Guidelines provided a range of twelve to eighteen months and I could find none in my own research.

In *Gall v. United States* and *Kimbrough v. United States*, the Supreme Court directs sentencing courts to treat the Guidelines no longer as edicts promulgated by an agency with knowledge superior to our own (the position in this case advanced by the prosecution without reference to the cited Supreme Court decisions), but rather as a set of essentially provisional recommendations valuable to the extent they are persuasive. *Gall*, 552 U.S. 38, 46 (2007); *Kimbrough*, 552 U.S. 85, 90-91 (2007) (both citing *Booker v. United States*, 543 U.S. 220, 260-62 (2005)).

According to *Gall*, the sentencing court must begin by "correctly calculating the applicable Guideline range." 552 U.S. at 49 (citing *Rita*, 551 U.S. at 347-348). Then, after giving both parties an opportunity to argue for the sentence they desire, the court must consider all of the Section 3553 factors to arrive at an appropriate sentence. *Id.* at 49-50. In making this determination, the court may not assume the recommended sentence is the correct one, but "must make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, the court must scrutinize the recommended sentence. In *Gall,* sentencing courts were directed that they may reject Guideline sentences if they are greater than necessary to achieve Section 3553(a)'s purposes. *Id.*,  n. 6.

The Presentence Investigation Report stated Brownfield's mother suspected he suffered from Post Traumatic Stress Disorder (PTSD) as a result of his military service,

including two deployments to Iraq (one as a contract employee) and one to Afghanistan, and another civilian contract tour in Uzbekistan following his honorable discharge from the U.S. Air Force.  She believed he had changed significantly from the time of his first departure for overseas duty.

As stated on May 20, 2009, by Robert Pyles, M.D., an experienced military psychiatrist and a former President of the American Psychoanalytic Association:

> The small size of our forces and the length of the war make repeated deployments inevitable.  It has been clearly documented that two tours is the limit most soldiers can take without serious psychic damage.  With each tour after that, serious mental health problems increase exponentially.

> In addition, the very real stigma regarding mental health issues prevents many from seeking treatment.  In a professional army, one visit to a psychiatrist, or one prescription for Prozac, can ruin a career.  We have put our people in an impossible situation.

Robert L. Pyles, Letter, When the Mind Is a Casualty of War, *N.Y. Times*, May 24, 2009, at A18.

Ms. Brownfield observed her son's difficulty with relationships, maintaining stable employment, managing his finances, insomnia, inability to focus on specific tasks, indifference to others, and alcohol abuse.  She opined that these difficulties were inconsistent with his behavior before he entered military service at age seventeen. To her, Brownfield appeared to be very nervous and confused about court proceedings.  She said he felt overwhelmed and had little recollection of having pled guilty.  He did not want to talk about his experiences in the war zones, with one exception, when he talked about seeing charred human remains and body parts and experiencing the smell of burning

human flesh.  Further, the Presentence Investigation Report recited incidents of his alcohol abuse, excessive sexual activity, fighting in bars, and domestic violence.

Recognizing that neither Brownfield's mother, the author of the Presentence Investigation Report, nor I am qualified to diagnose PTSD, but finding sufficient bases for suspecting that disorder or other war-zone related illness, I did not impose a sentence at the initial sentencing hearing and instead ordered both a psychological and a psychiatric evaluation.  Both evaluations were received and will be commented upon in detail below.

Because I advised the parties I was considering a sentence to probation with conditions including the provision for treatment rather than prison, after receipt of the mental evaluations the government requested a hearing to present witnesses.  Testimony was taken on October 1 and 2, 2009, and, again at the government's request, the parties were permitted to file written summary statements.  Those statements have been received.  After considering the entire file, the sworn testimony at the hearing, all reports of record, and the summary statements, this memorandum opinion follows.

## II.

### THE CRIME

The statutory penalty for a violation of 18 U.S.C. § 201 (b)(2)(C) is not more than fifteen years imprisonment; a fine of not more than the greater of $250,000 or three times the monetary equivalent of the value involved, or both; not more than three years supervised release; and the mandatory $100 special assessment fee.  The elements of the crime are that:  (1) a defendant was a public official of the United States; (2) he directly

or indirectly demanded, sought, received, accepted, or agreed to receive or accept something of value; and (3) he did so corruptly in return for being induced to do or omit to do any act in violation of his official duty. *Id.*

Brownfield admitted the following facts supporting his conviction:  he was hired by the U.S. Bureau of Prisons (BOP) to be a Correctional Officer and began his service at the United States Penitentiary at Florence, Colorado, in January 2007.  In June 2007, he was sent to Georgia for a two-week training session.  He was advised of his duties and responsibilities, warned of the perils of bribery, and told that providing contraband to inmates was prohibited.  He was instructed that staff misconduct is the most dangerous threat in a prison setting, compromises the security of the institution, and threatens the safety of other employees, the inmates, and the public in general.

Soon after returning from the training session in Georgia, Brownfield began accepting bribes amounting to several thousand dollars to provide tobacco to at least seven inmates.  In August 2007, an inmate provided information to prison officials that he had paid $200 to Brownfield in exchange for a bag of Bugler brand smoking tobacco. Brownfield received the bribe from an outside-the-institution source via Western Union moneygram.  Several other inmate sources provided further information that Brownfield was smuggling cigarettes into the institution for inmates and receiving $200 per carton. Telephone conversations Brownfield had with outside sources were monitored and corroborated information that Brownfield was in contact with an inmate's wife in connection with receiving the bribes and smuggling the tobacco into the institution.

Video recordings taken during Brownfield's work shift during the relevant time showed him passing to an inmate yellow colored items he appeared to have concealed on his person.  On October 3, 2007, one of the outside sources placed a monitored call to Brownfield and arranged to meet him on the following day in the parking lot of a retail store.  Brownfield agreed to accept $1300 in cash and bulk smoking tobacco from the source.  He also acknowledged in the conversation that in September 2007 he had received a check for $1000 with the payee portion left blank.  Further, Brownfield agreed to keep $1000 for recent introductions of the contraband, to take two cans of Bugler smoking tobacco into the institution within the following week, and to provide $300 in cash to an inmate who would then give the cash to another corrupt officer.

On October 4, 2007, the arranged meeting in the parking lot took place. Brownfield accepted $1300 in cash and two six ounce cans of Bugler smoking tobacco. The meeting and the exchange were videotaped and the conversations monitored by law enforcement officials.  Brownfield was followed as he drove to the prison to begin his shift.  He was confronted and searched.  Three hundred dollars in cash was found in his pants pocket.  His car was also searched, and $1000 cash and two cans of smoking tobacco retrieved.  Brownfield readily admitted his criminal conduct, provided additional details, and stated he was owed an additional $2000.  He disclosed the names of all inmates with whom he had had illicit dealings.  At first he lied to keep from identifying the other corrupt officer, but then disclosed that officer's identity as well.  He tendered his resignation.  He made further telephone contact with the inmate's spouse and advised her that he had been caught and that he had resigned.

III.

THE SENTENCING GUIDELINES

In accordance with *Gall v. United States*, I begin my sentencing analysis with a review of the advisory Sentencing Guidelines. 552 U.S. at 49. The United States Probation Office has calculated the total offense level for Brownfield under the Guidelines at 13. Presentence Investigation Report, p. 8. Brownfield has no prior record and his criminal history category is I. *Id.* There are no enhancements and thus a guideline sentencing range of twelve to eighteen months is recommended. *Id.* at 13. By statute, Brownfield is eligible for probation of not less than one nor more than five years. 18 U.S.C. § 3561(c)(1) (2006). The Sentencing Guidelines advise, however, that because the applicable guideline range is higher than Zone B of the Sentencing Table, he is not eligible for probation if the Guidelines are followed. U.S.S.G. § 5B1.1(a)(2). The maximum statutory fine is $250,000 and the guideline provision is $3,000 to $30,000. 18 U.S.C. § 3571 (2006); 18 U.S.C. § 201(b)(2)(A) (2006); and U.S.S.G. § 5E1.2(c)(3). Given Brownfield's lack of assets, the Probation Department does not recommend a fine. The government claims no financial loss and therefore restitution is likewise not a factor.

The facts bearing on this sentence are uncontested and indeed stipulated to by the parties. No objection to the guideline calculations has been made and they are, upon review, accepted as correct. For reasons which follow, however, and recognizing that the guideline recommendations are advisory only, I choose not to apply them in this case.

"[T]he Guidelines give a district court a measure of national practice to use as a starting point . . .." *United States v. Smart,* 518 F.3d 800, 808 ( 10th Cir. 2007). As the Supreme Court stated in *Gall*, some sections of the Guidelines are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." 552 U.S. at 46. The Court notes, however, that "not all of the Guidelines are tied to this empirical evidence." *Id.*, n. 2. In the category of crimes committed by returning military personnel and veterans from the war zones, such "extensive empirical evidence derived from the review of thousands of individual sentencing decisions" does not presently exist. As more military personnel return, we can expect such distressing data to become available. By August 2, 2008, the Pentagon listed more than 78,000 service members as wounded, injured, and ill.[2] The total number of troops deployed is not available, but, all of them, upon return, are susceptible to PTSD or other war-zone related mental illness — not just those who are wounded, injured, or ill when they return . We are now, in a manner of speaking, charting unknown waters. While I have considered the advice of the Guidelines, I find they do not address the myriad factors that must be considered in the circumstances of this case.

As directed by the Tenth Circuit's holdings in *United States v. Huckins* and *United States v. Munoz-Nava*, I make the following findings: (1) the Guidelines are not mandatory; (2) no objections to the facts or calculations provided by the Probation Office and subjected to examination by the prosecution and the defense have been made and the calculations are correct; and (3) both parties have been given full opportunity to file briefs and present evidence and arguments relative to the sentence to be imposed. *Huckins*, 529 F.3d 1312 (10th Cir. 2008); *Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008). At the court appearance for sentencing, the defendant was afforded another and final

---

[2] Department of Defense: Afghanistan War (Operation Enduring Freedom, OEF), Casualties from October 7, 2001 through August 2, 2008; Iraq War (Operation Iraqi Freedom, OIF), Casualties from March 19, 2003, through August 2, 2008.

9

opportunity to make an allocution statement.  I will now consider the sentencing factors prescribed in 18 U.S.C. § 3553.

## IV.

### THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Brownfield's criminal conduct is described above.  It is, however, important to augment that description.  Brownfield began working for the BOP in January 2007.  He filled out his employment form accurately and completely.  He disclosed that he was an honorably discharged veteran who had served overseas.  No psychological interview or tests were administered or taken into consideration in the decision to hire him.  Whatever screening process was employed, Brownfield fully answered every question on the provided forms.  He received limited on-the-job training and was assigned to work alone in detention areas.  He complained about working alone and told his supervisor he was frightened.[3]

After approximately five months on the job during which Brownfield committed no violations or crimes, he was sent to Georgia for two weeks of formal training.  His performance in training was not good.  When he began working for the BOP, Brownfield was involved in a serious personal relationship; that relationship ended during the training period when he was advised that his then girlfriend had aborted their child without his knowledge or consent.  Having been raised in a church-attending, religious family with values opposed to abortion, Brownfield became severely depressed.  He

---

[3]There is no doubt that the BOP is understaffed, and that corrections officers are not paid well commensurate with job responsibilities and the skills expected of them.  Hiring decisions, in effect, are based on a priority of need and availability of applicants.

drank alcohol excessively, sometimes attending classes while drunk. He even had a refrigerator brought to his room to keep beer in.  He was offered psychiatric consultation, but declined for fear of failing the training program and losing his employment.  He returned to his job in Florence, Colorado, in a depressed condition.  His off-duty conduct was consistent with his self-destructive behavior on the job.

Brownfield describes the *fait accompli* abortion by his then girlfriend as the triggering event of his depression.  Only after returning from training in Georgia on June 14, 2007, did he begin his illicit smuggling activity.  During the same period he began looking for another overseas employment opportunity with defense contractors.

At least one other guard at the Florence facility was engaged in providing tobacco to inmates for money.  He had been employed for over ten years by the BOP.  This other guard warned Brownfield that his name "was being mentioned in the yard" (meaning inmates were talking about him) and that he should be very careful about whom he was dealing with.  Brownfield agreed to smuggle $300 to an inmate to be given to the other corrections officer who would in turn bring in more tobacco.  When discovered, this guard resigned his employment and stated that he had dealt with only a few inmates and that he was not smuggling contraband for the money, but that he merely wanted to befriend some of the inmates.

Special Agent Paul Edward Sullivan of the U.S. Department of Justice, Office of the Inspector General, investigated the present offense. He has been a criminal investigator for over seventeen years, investigating thirty to thirty-five contraband smuggling cases among others, with an estimated twenty to thirty occurring at Florence

and FCI Englewood, Colorado.  It is important to note that only ten of these cases were prosecuted.  Special Agent Sullivan's superiors decided not to investigate the other guard engaged in providing contraband to prisoners. He was not photographed on a security camera.

Special Agent Sullivan said most guards start providing prisoners with contraband after fourteen or so years of employment.  He had never before seen a corrections officer begin this activity in the first year of employment as Brownfield did. Special Agent Sullivan testified that at the time of the Brownfield investigation and thereafter, he was exceedingly busy and short-handed.  He said investigative resources were limited and "some cases are harder to prove with limited resources." The Brownfield investigation was straightforward and easy to prove, especially in light of Brownfield's full confession when arrested.

V.

HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Brownfield was born June 29, 1984, at Fort Knox, Kentucky, to a military family. He is the oldest of three children.  Until age five, he and his family moved frequently, living in Indiana, Georgia, and North Carolina.  In 1994 the family moved to Canon City, Colorado, and he has been a resident there since that time.  Following his graduation from high school, Brownfield enlisted in the United States Air Force at age seventeen.

The defendant's father, John K. Brownfield, Sr., is forty-eight years old and has been employed as a correctional officer by the BOP for the past nineteen years.  He is currently a Senior Officer Specialist, assigned to the ADX/USP Florence, the facility

12

commonly referred to as "Supermax." Brownfield, Sr., testified repeatedly that he is a recovering alcoholic who has been hospitalized for this disease on more than one occasion. He is also a retired U.S. Marine. His son's criminal offense has caused him considerable anxiety for which he has received counseling in an effort to reconcile his occupation and his feelings concerning his son's offense. Brownfield, Sr., and his wife are legally divorced. They lived separately for some time, but now live together.

The defendant's mother is Kristi Brownfield, age forty-eight. She is a teller employed by Power Credit Union in Canon City. She and her mother are devoutly religious people. She has participated in church activities throughout her life and has made certain that Brownfield and his two younger sisters have as well. The Brownfield family is close-knit and patriotic. They have cooperated with the Probation Department in providing information and have supported Brownfield throughout this investigation and prosecution. The family's church pastor for the past twenty years verified Brownfield's participation in his church and describes him and the family in positive terms. A family friend advised that as a child Brownfield took on the role of "big brother" in the neighborhood, watching out and being protective of younger children. As a child and adolescent he is described as having been respectful, courteous, and supportive of his family. He was a junior deacon in his church and traveled during summer vacations with his church group to Iowa to participate in Habitat For Humanity-type projects. Throughout his life, he has been an avid outdoorsman, fisherman, and hunter.

When he was thirteen, Brownfield was introduced to alcohol by the older sister of a friend.  There is no indication he continued drinking alcohol until his junior and senior years in high school (ages sixteen and seventeen), when he and other classmates drank vodka on some weekends.  He was never disciplined in school and was never arrested.  He made acceptable grades and was not a disciplinary problem.  He denies ever drinking alone or having blackouts at that time and indicates the drinking was a juvenile group activity.  Rather than alcohol dependence at that period of his life, he was an athlete who was on the varsity wrestling team and competed in martial arts at the Junior Nationals and the Junior Olympics.  Other than trying marijuana once in high school, there is no indication of illicit drug use, and he in fact expresses total rejection of illegal drugs.

Brownfield maintained steady employment both before and after his military service.  He began by mowing lawns and then worked in a car detailing establishment.  Following his honorable discharge from the U.S. Air Force on February 25, 2005, he worked from April 2005 through August 2006 in Iraq as a firefighter for defense contractor Wackenhut.  He also worked as a firefighter in Uzbekistan for Halliburton KBR.  From January 2007 until his resignation the following October, he was employed as a correctional officer by the BOP earning approximately $36,000 gross per year.  From October 2007 through February 2008, Brownfield was employed as a youth counselor at the Royal Gorge Academy, a private boarding school in Canon City.  From April 2008 through July 2008 he was employed as a salesman by Wireless Advocates, a cell phone company based in St. Louis, Missouri.  Since October 2008, Brownfield has been

employed as a heavy equipment driver for the Cripple Creek and Victor Gold Mine
Company.

Brownfield is married.  His wife is employed as a certified nursing assistant and
is pregnant with their second child.  Their first child was born June 24, 2008. Brownfield
was not married previously.

## VI.

## MENTAL AND PHYSICAL HEALTH ASSESSMENTS

Brownfield describes his physical health as good.  He is not currently under a
doctor's care.  As an athlete involved in varsity wrestling and competitive martial arts
before his military service, he was in excellent physical condition.  Upon enlisting at age
seventeen, he completed basic military training and successfully trained as a firefighter
and rescue specialist.  He was stationed in Spangdahlem, Germany, from December 2002
through February 2005.  He deployed to Afghanistan and then to Iraq.  During his
enlistment he received numerous awards and citations, including the Air Force
Expeditionary Service Ribbon (gold border), the Air Force Outstanding Unit Award, the
Air Force Training Ribbon, the Global War on Terrorism Expeditionary Award, and
various Achievement Medals for services performed in Operation Iraqi Freedom.  He
was honorably discharged on February 25, 2005.

From the time of his discharge to the present, Brownfield's life has drastically
changed.  He has not taken drugs, but has abused alcohol on several occasions and
presents serious problems overlaid with alcohol including personality changes,
hypersexual activity, road rage, and heightened anger.  He has engaged in several fights

with other men and was arrested on a domestic violence charge that was later dismissed. (His wife testified that she gave false reports of abuse to the Canon City police when both of them were engaged in a drunken argument. Brownfield does not deny the incident, but neither he nor his wife remember it clearly.)

Until quite recently, Brownfield had not participated in any mental health programs. He has visited a counselor at a clinic in Pueblo, Colorado, who is presently on maternity leave. Brownfield states he finds her very helpful. He has not yet received a full PTSD assessment from the Veterans Administration, but has completed a barrage of paperwork in order to be placed on a waiting list for such assessment. If it is determined that he does not have PTSD, it is still possible that he might have some other war-zone connected mental impairment. Once evaluated, he may qualify to be placed on another waiting list for treatment. The counseling he has received in the meantime was arranged by this court's Probation Department.

Brownfield testified at the hearing on October 2, 2009. I found his testimony credible based upon observing his demeanor, his utter lack of sophistication, his candid admissions of facts and conclusions that were not in his best interest, and, most of all, because his statements were consistent with other evidence over which he had no control or influence.

About three months into his deployment to Afghanistan, Brownfield was engaged in an off-base response to an explosion. As he recalled digging out the bodies of three adults and three children, he became tearful and found it difficult to speak. He testified

that upon seeing the first dead child he vomited.  He and his comrades then put the corpses into body bags.

Following this first experience he volunteered at the base hospital.  Afghans would bring their injured to the base entry control point, some with missing limbs, and Brownfield would transport the injured from the entry control point to the hospital where he would assist surgeons by pinching off arteries and other assigned tasks.  He had vivid memories of these experiences and of visiting with a twelve year old girl who had been in an explosion and was missing all of her body below her upper torso.  She died, and he stated, "I just got sick to my stomach and just quit doing it.  So I did my twenty-four hours and then I just sat in my hooch and didn't go back."

Brownfield's regular duties included firefighting involving burning aircraft and wildland fires; securing helicopters with loose-hanging ordinance; and removing injured pilots from aircraft,  putting them into ambulances, and transporting them to the hospital.  On some occasions, he participated in removing dead soldiers from Black Hawk helicopters.

After his first tour and following a home leave, Brownfield volunteered for a deployment to Iraq where he again engaged in firefighting and airport rescue.  He became quite emotional in testifying about removing a soldier from a Humvee vehicle that had been hit by an IED and cutting apart a crashed Black Hawk helicopter to extricate the body of a dead soldier.

Brownfield was honorably discharged from the Air Force on February 25, 2005.  He resettled in Ohio where his alcohol consumption increased significantly.  For the first

time since adolescence, he was unemployed and lived off his savings.  As he testified, " I got bored, real bored sitting around, so I signed up for Halliburton KBR and went to K2 Uzbekistan in April '05 to late August of '05."  There he engaged in firefighting at a supply base where planes would land and transport supplies to Afghanistan.

In September 2005, he returned to Canon City, Colorado, spent his savings and "just kind of relaxed doing my thing."  He felt uncomfortable and restless, so he signed up with Wackenhut and returned to Iraq in January 2006, where he remained until the following August.  On this tour he again engaged in rescue work and firefighting.  He stated, "The only incident that was really bad there was, I think it was an OH-58 Kiowa, he had—the gunner in the front and the pilot's in the back—both sat in the chopper, an AK-97 round went through his eye, killed him. So we had to go in there and pull his body out of the chopper.  And just take him, take him to the hospital.  That's all we could do 'cause he was already dead."

Following the second tour in Iraq, Brownfield returned to Canon City in August 2006 and began employment with the Bureau of Prisons in January 2007.  His behavior changed significantly.  He drank frequently and excessively, came home from bars having "blacked out," once with a broken arm, other times with cuts from fighting.  His parents and sisters remonstrated.  He testified, "My sisters would say I'd just lose my temper and just scream at them at the top of my lungs, until my throat hurt.  Even yell at my own mother!"

Brownfield admits to having a great deal of anger and road rage when another driver would cut him off or brake in front of him.  "I mean I've jumped out of my

vehicle, I've been so mad over a simple thing as road rage.  Sometimes the littlest things like I get furious, you know, I've had every one of my family members with me at one time or another, and they look scared seeing how mad I get."

Brownfield has trouble sleeping, a difficulty that was not present before his military service.  He has taken various kinds of prescription sleeping pills with no effect.  He has had night sweats and nightmares.  His nightmares used to be about his experiences in war zones, but now involve bad things happening to his infant daughter and other members of his family.  He stated, "Sometimes I'll drive past a wreck, and it will hit something, hit an emotion and sometimes I have problems that day."  Auto wreckage triggers a memory of things he witnessed in the war zones.

Brownfield cannot explain his crime other than to describe it as the "path to destruction."  He said, "I mean I don't know what my true motivation could have been.  I was doing so much stupid stuff during that time.  I couldn't —I didn't know what my motivation—I mean I was being very reckless with everything in my life.  My off-duty actions and on-duty actions."  When asked about his off-duty conduct fighting in bars, he testified, "The only thing that kept me out of trouble was knowing the bouncers at all the bars in Canon, and they'd get me outside to my car or they'd kick the guy out that I got into a fight with or they'd separate us before it got worse.  You know, they never really had the cops called 'cause it was all handled in-house."

Figuratively speaking, Brownfield returned from the war, but never really came home.  The Iraq War Clinician Guide acknowledges the potential difficulties service men and women such as Brownfield face upon their return home from Iraq as follows:

A variety of factors including personal and cultural characteristics, orientation toward coping with stressors and painful emotions, pre-deployment training, military-related experiences, and post-deployment environment will shape responses to Operation Iraqi Freedom.  Furthermore, psychological responses to deployment experiences can be expected to change over time.  The absence of immediate symptoms following exposure to a traumatic event is not necessarily predictive of a long-term positive adjustment.  Depending on a variety of factors, veterans may appear to be functioning at a reasonable level immediately upon their return home particularly given their relief at having survived the war-zone and returned to family and friends.  However, as life circumstances change, symptoms of distress may increase to a level worthy of clinical intervention.

Department of Veterans Affairs, *Iraq War Clinician Guide* 1 (2004).

The mental health professionals who have examined Brownfield have filed evaluations.[4]  All three recognize that before his mental health difficulties can be properly addressed and treated, he must first sustain a period of at least six months of sobriety.  He has besotted himself with alcohol, perhaps self-medicating underlying symptoms of depression and anxiety.  All three, a psychiatrist, a clinical psychologist, and a certified professional counselor (LPCLAC), agree that the primary diagnostic axis using the DSM-IV-TR is alcohol dependence, that abstinence from alcohol is the first priority of treatment, and that psychotherapy is then required.

The three assessments were each based on a single clinical interview and psychometric testing session.  In view of these limited examinations and the fact that Brownfield has been suffused with alcohol, it is not surprising that the diagnostic axes vary.  The psychiatrist lists anger, depressive symptoms, and anxiety followed by a detailed diagnosis:

---

[4]The psychiatrist and the psychologist performed evaluations pursuant to court order.  Because of the delays in obtaining evaluation and treatment from the Veterans Administration and clear indications Brownfield was in need of treatment, the Probation Department arranged for the services of a professional counselor and she reviewed the psychiatric and psychological reports and proceeded in accordance with their primary recommendations.

I:       Intermittent Explosive Disorder (provisional) vs. Antisocial Traits
Impulse Control Disorder NOS (sexual)
Rule out Adjustment Disorder with Mixed Anxiety and Depressed Mood
vs. Substance-Induced Mood Disorder (Alcohol)
Alcohol Dependence
II:     Cluster B Traits (Antisocial and Narcissistic)
III:    None
IV:    Legal, Financial, some relationship conflict, death of grandfather, father
with Substance abuse problem
V.     60

      The Diagnostic Impressions of the clinical psychologist are: Axis I: 303.90

Alcohol Dependence, 309.28 Adjustment Disorder with Mixed Anxiety and Depressed

Mood; and Axis II: 301.7 Antisocial Personality Disorder.[5] The Certified Professional

Counselor does not make an independent diagnosis, but cites the other two diagnoses and

concurs in the primary objective of treating Brownfield for alcohol dependence before

addressing the underlying concerns.  The psychological evaluation summarizes their

recommendation best:

---

[5]This last mentioned impression is problematic because there is nothing in the reports, the transcripts of
testimony, or documents on file that suggest any childhood or adolescent behavior abnormalities.  The
DSM-IV-TR 301.7 Antisocial Personality Disorder provides as its diagnostic features, "a pervasive pattern
of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and
continues into adulthood."  Cluster B as identified by the psychiatrist includes Antisocial Personality
Disorder among numerous other possible diagnoses. The commentary relating to the differential diagnosis
of 301.7 states, "The diagnosis of Antisocial Personality Disorder is not given to individuals under age 18
years and is given only if there is a history of some symptoms of Conduct Disorder <u>before</u> age 15 years.
For individuals over age 18 years, a diagnosis of Conduct Disorder is given only if the criteria for
Antisocial Personality Disorder are not met.  When antisocial behavior in an adult is associated with a
Substance-Related Disorder, the diagnosis of Antisocial Personality Disorder is not made unless the signs
of Antisocial Personality Disorder were also present in childhood and have continued into adulthood."
(emphasis added)

After sustained period of sobriety spanning at least six months, re-assess Mr. Brownfield for the possibile presence of mental health difficulties. It remains possible that his alcohol dependence masks or alleviates underlying symptoms of depression and anxiety. However, assessing this possibility with any accuracy will not be feasible until he demonstrates prolonged sobriety.

When Brownfield was cross-examined by the Assistant U.S. Attorney, he was asked, "So you chose, knowing that, and knowing right from wrong, back during that time frame when you came back from the training, for some reason you chose to violate the law, correct?" He replied, "Ma'am, during that part of my life, I did a lot of things that I knew were wrong. And I still have no clue why."

As stated at the beginning of this lengthy description of Brownfield's mental health, I do not purport to be competent to make a psychological diagnosis. I do not know whether Brownfield suffers from PTSD or some other war-zone related ailment. I can state, however, that this defendant entered military service at age seventeen and experienced three tours of duty in war zones where he experienced extreme stress and witnessed horrific scenes of human carnage. He also experienced a major stressful event during his training in Georgia with the Bureau of Prisons when he learned that his girlfriend had aborted her pregnancy, and he describes this event as the trigger for his subsequent criminal behavior.

It is clear, however, that at no time, before or after hiring, did the Bureau of Prisons conduct a mental evaluation or screening of this then twenty-two-year-old defendant. In light of the problems faced by many veterans returning from war zones, especially after multiple deployments, agencies should be alerted to proceed with a thorough evaluation. Brownfield did not participate in any mental assessment during the

hiring process or during his nine-month term of employment with the Bureau of Prisons. He was classified as a "provisional hire" allowing the bureau to employ him before starting or completing a background investigation.

VII.

THE NEED FOR THE SENTENCE IMPOSED

Section 3553's  salient purpose is set forth in the first sentence, "The court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Paragraph (2) of Section 3553 lists the following purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . ..

With the "nature and circumstances of the offense and the history and characteristics of the defendant" in mind, I have considered each of these factors in determining the appropriate sentence in this case.  18 U.S.C. § 3553(a)(1).

*A. Reflecting the Seriousness of the Crime*

There is no doubt that smuggling contraband into a correctional institution is a very serious crime which can create havoc in the institution, endanger the safety of the staff and inmates, and undermine the security of the public at large.  It is known that manipulative inmates will importune corrections staff first to bring in less dangerous

23

contraband such as tobacco and currency and then increase the stakes to narcotics, cell phones, and eventually weapons.[6]  Any introduction of contraband, even that which is seemingly innocuous, has the potential to foment disaster and therefore must be subject to vigorous prevention and detection.

Accordingly, it is necessary to impose a punishment which adequately reflects the seriousness of this crime.  Imprisonment, however, is not the only means of punishment, and, throughout the history of civilization, punishment has been curtailed because of the frailty of the defendant and his or her need for treatment.[7]  Moreover, as recently as November 30, 2009, in *Porter v. McCollum*, the Supreme Court stated in a per curiam opinion, "Our nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did."  130 S. Ct. 447, 455.

Probation is indeed punishment.  As Justice Stevens wrote in *Gall v. United States*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

---

[6] See, e.g. Bud Allen and Diana Basta, *Games Criminals Play* (1989).
[7] For a full discussion of the cases and literature on this point see *United States v. Rausch,* 570 F.Supp.2d 1295 (D.Colo. 2008).

552 U.S. at 48 (citations omitted).  In support of this statement, Justice Stevens cites the

statement of the Advisory Council of the National Council on Crime and Delinquency

which provides that, "Probation is not granted out of a spirit of leniency. . ..  As the

Wickersham Commission said, probation is not merely 'letting an offender off easily'."

*Id.*, n.4 (quoting Advisory Council of Judges of National Council on Crime and

Delinquency, *Guides for Sentencing* 13-14 (1957)).  He also cites a preeminent text on

the subject of probation and parole, which states:

> [T]he probation or parole conditions imposed on an individual can have a
> significant impact on both that person and society . . .. Often these conditions
> comprehensively regulate significant facets of their day-to-day lives . . .. They
> may become subject to frequent searches by government officials, as well as to
> mandatory counseling sessions with a case-worker or psychotherapist . . ..

Neil Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999).

It is pointless to discuss whether a sentence to one year and a day followed by two

years of supervised release as recommended in counsels' plea agreement is more or less

punishment than five years of probation with strict conditions.  Both the probation and

the sentence recommended in the Presentence Investigation Report satisfy the stated

purposes of paragraph (2)(A) of 18 U.S.C. § 3553 (a) "to reflect the seriousness of the

offense, to promote respect for the law, and to provide a just punishment for the offense."

### B.  Affording Adequate Deterrence

The testimony in Brownfield's sentencing hearings disclosed that contraband,

whether smuggled in by staff or visitors, is a constant problem.  By no means are all

smugglers discovered and not all of those discovered are prosecuted.  According to

Special Agent Sullivan, there are only five agents in the office in Denver responsible for covering an eleven-state area.  These agents are assigned to investigate criminal cases involving not only the Bureau of Prisons, but also the Federal Bureau of Investigation, U.S. Marshal's Service, the Drug Enforcement Agency and others.  Nationally, approximately 985 law enforcement and correctional officers are currently imprisoned, not all of whom were convicted of bribery offenses such as this one, but they nevertheless represent the need for vigilant enforcement of the law against public officials.

Of the twenty to thirty criminal investigations involving officers at Florence and FCI Englewood, fewer than half were prosecuted.  Some were not brought to the attention of prosecutors, and in other cases the prosecutors declined to proceed.  Because of the continuing presence of contraband in correctional institutions, one can only surmise that not all acts of smuggling are discovered.  The phenomenon continues and thus raises questions about the effectiveness of deterrence through punishing some, but not all offenders.  The driving force of general deterrence is certainty, not severity or length, of punishment.  *See* Andrew von Hirsch, Anthony E. Bottoms, Elizabeth Burney, and P-O. Wikstrom*, Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research* 45, 47-48 (1999).  It follows that imposing an unnecessarily severe or inappropriate sentence upon Brownfield will achieve no appreciable benefit in general deterrence.  More diligent and consistent enforcement and prosecution, however, would pay greater dividends that would comport with general principles of deterrence.

### C.  Protecting the Public From Further Crimes of the Defendant

Deterring Brownfield from committing crimes similar to the one to which he has pled guilty is not problematic.  Now that he has a felony conviction, he is permanently barred from law enforcement or corrections employment.  That he is one of fewer than half who have been prosecuted for similar crimes reduces the deterrent effect to pure chance. The problem remains, however, to determine what disposition is just and appropriate in this particular case.  There is no doubt that Brownfield needs mental health treatment, and with treatment the chances of his becoming a recidivist will be significantly reduced.

### D.  Providing Defendant with Needed Medical Care in Most Effective Manner

To protect the public from further crimes by Brownfield, in accordance with Section 3553(a)(2)(C), mental health treatment is required. Any delay in such intervention is likely to exacerbate rather than ameliorate his symptoms of anger, rage, brawling, and other antisocial conduct.  Given the paucity of prison programs available to those serving one year or less and the relative lack of expertise compared with the Veterans Administration in treating war-zone related illnesses, corrective treatment will be more readily realized by a lengthy sentence to probation rather than a comparatively abbreviated one to prison.  In the circumstances of this case I find that a sentence to prison is inappropriate for achieving Section 3553(a)'s purposes.

The Sentencing Guidelines do not contemplate the fact that Brownfield has had three tours in war zones where he had direct experience with the horrors of war.  It would

27

be a grave injustice to turn a blind eye to the potential effects of multiple deployments to war zones on Brownfield's subsequent behavior. A lengthy sentence of probation requiring effective treatment as determined by qualified experts ensures that these factors are adequately addressed.

In considering all of the foregoing, I have decided to sentence Brownfield to five years of probation subject to special conditions in addition to those imposed on all probationers in this district. Brownfield must pay the special assessment fee of $100 immediately. Given the recommendation of the Probation Department, Brownfield's lack of financial resources, and the expenses he will incur for treatment in order to comply with the conditions of probation, no fine will be imposed.

The special conditions of his probation are these:

1. Brownfield shall participate fully in any and all treatment programs as ordered by his Probation Officer including, but not limited to, alcohol and other substance abuse programs, mental health treatment and counseling, financial counseling, marriage and family counseling, driver safety courses (including road rage prevention), and pastoral counseling. He shall pay the costs of any and all of these programs in which he is directed to enroll by the Probation Officer. Brownfield shall participate fully and remain actively enrolled in each such program unless and until his Probation Officer excuses him from further participation.

2. Brownfield shall prepare a budget based on his income and expenses to be approved by the Probation Officer, and he shall live within the limits of that budget. He

shall not incur any new debt or financial obligations in excess of or differing from the approved budget without first obtaining the Probation Officer's authorization to do so. For purposes of illustration only, he may not purchase a motor vehicle or real estate without such prior authorization.

3.  Brownfield shall pursue without delay or procrastination, and give highest priority to, securing a Veterans Administration mental health evaluation and, if accepted for treatment, shall participate in whatever treatment is offered and recommended by the Veterans Administration staff.

4.  Brownfield shall not purchase any alcoholic beverages for his own or any other person's consumption.  He shall not visit or remain in any establishment that obtains 49% or more of its gross revenue from the sale of alcoholic beverages.  In other words, he may frequent restaurants, but not bars, beer joints, or recreation parlors.

5. Upon the recommendation of the Probation Officer and a determination by the Court that it is in Brownfield's best therapeutic interest, the term and conditions of probation may be modified or reduced at any time after three years from the inception of this sentence.

Brownfield is hereby advised that should he fail to abide by these specific conditions as well as the conditions generally imposed on all probationers in this district, such as the prohibition from associating with any persons with criminal convictions, the commission of any violations of law, state, local or federal, the possession or use of any firearms, the requirement to assist in providing DNA samples, and the requirement to

report to the Probation Officer any violation of the terms and conditions of his probation, and his probation is revoked as a result thereof, he should anticipate a sentence to prison substantially in excess of that recommended in the Presentence Report.

Dated December 18, 2009, *nunc pro tunc*                    By the Court:


John L .Kane

United States Senior District

Judge

30